We'll hear the next case, Aetna versus the pharmaceutical companies. Evans-Wolf. Your Honors, and may it please the Court, I'm Evans-Wolf. I'm representing Aetna and joining with us in this appeal are Mr. Peter St. Philip and Uriel Rabinowitz of the Lowy Firm, representing a large number of other third-party claims administrators of self-funded plans, class members in this class act. The case turns on a simple issue, and this is what makes it unusual. The Court here, while approving the settlement, found that the claims administrators had the authority to opt out on behalf of the self-funded plans, but then refused to find that they had that same authority to file a claim in the self-funded plans, but then refused to find that same authority to opt them out. That's what makes the case difficult. It makes it different from all of the many that we've seen. The District Court wanted further proof that the claims administrators had the authority to opt out for the customers? The District Court wanted further proof, but we would submit such – created such a high burden as to make – Why is it such a high burden? I mean, where is the abuse of discretion that the District Court said, I'm not satisfied unless you provide something more? What would have been the problem with having something signed by a customer? Here we submit that the original problem is that the Court was willing to find that they had the authority to go one way, but not the other. That is to say, they had the authority to – Well, of course, because there were very different consequences when it came – when it comes to opting out, if down the line the District Court was faced with individuals who disputed your authority to opt out for them, we didn't know this, we really didn't want it, he would have had a holy mess on his hands, and more importantly, the folks who were paying the So, where is the abuse of discretion? The abuse of discretion is first, and I still have to return to the fact that there's – it's essentially a one-way settlement class, that the – they recognize the authority to opt in in a way that favors the settling parties. Very different consequences, opting in and opting out. There's no opting in, there's no opting in. I'm sorry, file a claim. I appreciate the correction, Your Honor, but I would suggest that it amounts to the same thing. It's a much more solemn change of rights for a party to file a claim than it is to opt out. When a party files a claim, their – But, your – the claims administrators could have prepared opt-out forms, sent them to the customers, all they would have to do is sign their names and mail them in, or email them in, however it was being done. Well, in fact, if you look – And then there would have been unassailable that indeed these individuals wanted to opt out. But, might I point out, Your Honor, that had they done that, then they might as well have opted out directly. They've essentially created – they essentially – Why is that an abuse of discretion if a district judge wants to be more satisfied that indeed people really want to opt out? Because the right to opt out is the one that's protected by due process. It's protected by the rules enabling it. How is this a due process violation to require someone who wants to opt out to sign a piece of paper saying, I am opting out? It's the gross disparity between the filing of a claim and the ability to opt out. It's a clear thumb on the scale in favor of the settlement to the detriment of the substantive rights of the parties to be left alone, which is protected as a matter of due process under the Supreme Court law. How interesting that you didn't object before preliminary approval because the notice that was sent to everyone, including your clients, gave clear – and your clients directly – gave clear notice of this requirement to establish authority. Well, in fact, the notice didn't go out until after the hearing for preliminary approval to all of the self-funded plans because they are absent class members in this case. We think that – there are two points to the waiver argument that's raised against this. First of all, Judge Underhill, to his credit, grappled with all these issues and passed upon them and therefore they are properly before this court. Second of all, it was entirely proper for the self-funded plans through their claims administrator to opt out and then litigate the propriety of their opt-out and the requirements to opt out in the context of the objection at which all these issues were – the objection or the motion to strike their opt-outs – at which all these issues were raised and thoroughly thrashed out. Am I clear that you did not object to the opt-out procedures that the district court wanted until after the deadline had passed? That's not entirely correct, Your Honor. Your Honor, the – a letter was filed by the Lowy firm earlier on in the process in which they represented – they stated that they represented Humana and a large number of other third-party payers and we would suggest that that preserved the objection there. I return, however – Is that in the record, in the appendix? Yes, it is. Yeah, when you come back up for rebuttal, will you tell us what page it's at? I can tell you right now. Tell us right now. If you have it. Is it JA-345? Yes, it is. Thank you, Your Honor. And did you object to the procedures on behalf of the entities that you represented? We were objecting to the procedures and to the – essentially, the order that we're The self-funded plans. No, I'm asking you something different. Before you sit down, I'm just simply asking were you specifically objected to the procedures that Judge Underhill wanted to use before the opt-out deadline had passed? I think that this JA-345 did make such an objection in the context of the motion for preliminary approval. All right. We'll take a look at it. Thank you. Thank you. We'll hear from California or Orange County. Good morning, Your Honors. My name is John Alden Mead. May I please? So, why didn't you file the appeal bond? You've created all this work for not filing an $18,000 appeal bond. It's the – it's not the amount of money that's involved, Your Honor. It's the sovereign prerogative of the state of California, as represented here through the Orange County District Attorney, to not submit itself to the jurisdiction of the federal courts. You came into court to seek relief. Yes, I understand that question, Your Honor, but of course, that – the first thing we find – Does this mean if you're sanctioned, you won't pay? I think we'd have to take it up because – Take it up where? I guess the next court is the United States Supreme Court, but I don't know. I don't have an answer to that. I haven't actually considered – You will not assure us now that if you lose – if we impose sanctions, you will not assure us that the Orange County DA will pay the – any award of fees and costs? I would think, Your Honor, that – Subject to your right to appeal. Right. Subject to the right to appeal. Obviously, as I said at the district court level, the federal courts are the ultimate arbiter of the balance of sovereignty between the states and the federal government. So, yes. The problem is refusal to pay. I mean, you can pay, obviously, reserving your rights. Right. And then if you prevail, you'll get the money back. But the fact that you won't even post it is troubling. I understand that, Your Honor. My client, the Orange County District Attorney, and it was originally Mr. Tony Rikakis, and now it is Todd Spitzer. Rikakis is out – was voted out. Correct. And the new district attorney, Todd Spitzer, is – so we've substituted his name in. And he's – you know, nothing has changed in terms of the client's wishes. So – I didn't understand that. What do you mean, nothing has changed? Well, there was some speculation at one point in some of the opposing briefing that when a new district attorney came into office, that he might change his mind about whether to continue pursuing the case. And that has not happened. So you will pay the sanction if imposed? I believe so, Your Honor. I think we would take the right – we would take the appeal. We would probably take the appeal. But as I said, ultimately, the federal court system is the ultimate arbiter of the balance of sovereignty between the two systems. So once we lose at the end, yes, we lose. So do you dispute this court's jurisdiction over this matter that you're addressing here now? Yes, that was supposed to be the first thing I was supposed to say, Your Honor. The whole reason for us being here was about the lack – We have jurisdiction to hear the merits of your appeal, but not to require an appeal bond. That's what you're saying? It all stems from the single observation – What are you saying? Our position is that there is no jurisdiction over the state of California. And so we've made that special appearance for that purpose. There are things that stem from it, but it's not an unusual position to take. It happens for personal jurisdiction in an individual context quite a bit, but in the case of a sovereign, that was the – It's quite unusual. You're coming in here to try to upset a settlement that involves lots of money and lots of interest and lots of parties. Well, I understand that, Your Honor. But regardless of what happens here, it's even admitted by the other side that the California case is alive and well and going. There's only an overlap between the claims presented in the California case and the claims presented here. It's just an overlap. The overlap is with respect to otherwise private individuals, their restitution claims only, whereas California is all the people of the state of California, governmental and private alike. What you're trying to do is cut a gaping hole out of this case. You're saying that this settlement doesn't – because of the action you've brought out there, doesn't bind your 29 million or how many there are citizens. Right, well – That's what you said in your brief. Certainly, it's an observation – and I've cited, Your Honors, to the Flonase case out of the Third Circuit last year, which talks about how the dual sovereignty system is not a model of administrative efficiency. It is known and acknowledged and even endorsed by the United States Supreme Court that there are difficulties posed by this dual sovereignty system. Of course there are. That's why people hire lawyers. Right. And what we suggest, Your Honor, and we have acknowledged – and I guess I'll do some of it into my next time – but we have acknowledged that there are circumstances under which this type of settlement can occur and have a res judicata effect. Explain the theory under which you come into this court and argue that a case filed a while back in California divests this court of jurisdiction over a very large number of people – Yes. And would upset the settlement, but we have no – it's your position we have no authority to address that legal issue? Our – you have the authority to recognize that the district court did not have jurisdiction to approve a settlement that would bar the claims that are being separately pursued and filed earlier. And that's – and there's a big timing issue in all these briefs where they talk about who filed first. Now, when you file a class action, you are – it's a putative class action, whereas when the Orange County district attorney filed suit, it has preexisting statutory authority under the unfair competition law. It's section 17200.  When that right is exercised prior to even a motion for class certification at the federal level, that timing is what matters. And so we have acknowledged that we can't come behind after the fact for these private citizens if there has been a settlement. But if there's no certified class and there's no settlement, the district attorney of Orange County's authority is superior in rank to represent those individuals. Suppose hypothetically every single class member was a resident of California and you file such a suit. End of suit in federal court? If we filed a suit in federal court? No, no, no. Let's say a suit was filed in federal court and it turned out the class members were all California citizens and you brought a suit. Yes. So what effect would that have on the putative class action in federal court? Everyone who wasn't actually already deemed as having been represented by the 23B class reps would no longer be eligible for inclusion. They're no longer absent. So that's what the Rule 23… Well, in my hypothetical, they were all represented by the 23B rep, but they were all California citizens. You filed a suit. What happens? If that class is already certified, they're already represented. And so I think we would have a much more difficult time. Certainly, there's probably a little bit of a gray area between class certification and… Your argument was that your representation arises out of a principle of law. It does, Your Honor. So here, it's a little bit easier because we filed suit prior to even a motion for class certification, because that wasn't done until the context of settlement. Your question is, if it happens between class certification and settlement, I wouldn't want to be there, and I think we would have some serious trouble. But I don't know how that would turn out. I think we would have a problem, and we'd have to litigate that particular issue. It's not what's presently before the court. I understand that class certification gets moved later and later, but that's one of the problems with moving class certification later in these cases, is that you really don't have – you have all these absent class members. And when you have preexisting statutory authority that the DA can invoke, he becomes their lawyer immediately. And that's what the people of California, through popular will, through legislation, have decided to do. California's… In this whole case, what difference does class certification make? Well, class certification is limited to absent class members. And the question is, were these class members absent? And we submit that they were not. If a California resident wanted to opt out, could the resident do so? Yes. Yes. Even though you've asserted your authority on behalf of all California residents? Yes. So that happens sometimes, and… Did that happen here? It did not happen here, no. Okay. What's the procedure for that happening? So when an individual files their own suit, gets their own lawyer, and they're not represented through a 23 class rep or the Orange County DA, their suit is allowed to proceed. However, what often happens is a defendant's move to coordinate and consolidate those cases. And ultimately, that's what… Does the California Attorney General agree with the position you're taking here? So there's a current dispute about the geographic scope of the Orange County District Attorney's authority. And that is presently before the California Supreme Court. That will be orally argued before May of 2020. So the Attorney General's position is consonant with ours, except on… They filed an amicus taking a different position regarding whether or not an individual district attorney can seek monetary relief outside the geographic boundaries of that county. You're doing that? Oh, yes, we are. That's essentially the status quo. What does the Attorney General think you can do? In his amicus brief, it's a little more complicated than that. There are caveats, but essentially, if you boil it down, that's his position. There are a whole line of cases where, you know, the status quo right now is that we can or… Not in this case, because we've lost at the appellate level, but these cases have been happening that way the whole time. And now this is a new development in the law where the appellate court in San Diego struck those part of our allegations. We filed for cert with the California Supreme Court. It accepted cert. All the briefs are in. All the amicus briefs are in. And the California Supreme Court will be the arbiter on that, because it's purely a state law issue. Sounds to me like a big mess. It is. But I think we'll have some real clarity. It's properly briefed, and we'll have an answer. You're well over your time. We'll hear from the other side. May I please the court? Catherine Mims for the Barrier-Ingleheim Defendants. I plan to speak for four minutes to address the Orange County District Attorney's objection, and then we'll cede the floor to COAP police, Mr. Shadowin and Mr. Burgess, to address the insurer's issue. The District Attorney brought up a number of legal issues, both in his briefing and here before you this morning, and I just want to briefly set back to why we're here today. After four years of vigorous litigation, including litigating California state court claims, at the end of fact discovery, as the parties were entering settlement negotiations, counsel for an IPP opt-out in this MDL goes to California and finds a district attorney, a county district attorney, and files a state court enforcement action alleging almost completely verbatim the allegations of the EPP class in this MDL. What the District Attorney is asking this court to do is to hold that the mere fact of filing in California state court somehow removed entirely all California purchasers from this class action and made them ineligible for inclusion in the settlement. The law simply does not allow this. At the outset, the Orange County District Attorney didn't have standing to object to the settlement, so Judge Underhill could not possibly have abused his discretion in entering final approval of the settlement over that objection. But to get to the outcome that the DA wants you to get to, this court would have to jump through so many hoops, and at every single leap, there is a mountain of precedent to the contrary. There were a number of issues that he addressed this morning. I think we have been through them in our briefs, but to point to just a couple. One, as Your Honor pointed out, the hypothetical that if we have a class action that it consisted, in this case, entirely of California residents, the DA would have you say that despite all of those judicial resources, the tremendous resources expended by the parties, the efforts and the litigation, that the entirety of that would go away just because he filed an action. That would defeat the entire purpose of CAFA, Rule 23, and the entire MDL process. And secondly, the DA puts a lot of emphasis on the timing of operations here. The fact that the class action was filed, but the class representatives didn't have the class certification before he filed the state court action. When asked by Judge Underhill, is there a case that says that the timing of this matters, the DA was unable to provide any authority. And there isn't any authority that we are aware of either. The only thing he can point to is the Intelligender case, which simply does not say that the inverse timing would apply. We've cited a number of cases, however... You said in your brief that you believe that Mr. Meade's arguments were frivolous. We have asserted in our brief that he is continuing to assert arguments that are frivolous, that are so contrary to the weight of precedent. And Judge Underhill has also referred to them as frivolous. And you continue to believe that? Yes, we do. Thank you, Your Honors. Good morning, Your Honors. May it please the Court, Steve Shadowin on behalf of the plaintiffs. Unless the Court has further questions about the DA appeal, I'll address the Aetna appeal. With respect to the Aetna appeal, Judge Underhill faced a practical problem. This was not the first rodeo. Dating all the way back to 2005, this group of claims administrators, with a lot of the same lawyers, have taken the position that the claims administrators had authority to opt out on behalf of these plans, where they administer the plans' claims. And the district court in the Central States case, ultimately affirmed by this court, found as a matter of fact in that case that the claims administrator did not have the opt-out authority that it claimed to have. Then the Remeron case in 2005, the district judge there had the same qualms. One corporation, unrelated to another corporation, comes in the court and says, oh, trust me, I have authority to opt out on behalf of that unrelated corporation. And the district judge there said, I want you to provide me some written evidence that you have that authority. Rather than face that evidentiary hearing that the judge set, the claims administrators backed down and said, no, that's okay. These plans will remain in the class. The judge in Skalaksen in 2015, now with Central States and Remeron on the books, says, I'm going to have an evidentiary hearing as to whether or not you claims administrators have the authority that you claim to have. And again, the claims administrators backed down and said, oh, no, we don't want an evidentiary hearing. Those plans will remain in the class. 2017, Judge Orrick in the Lydenderm case out in California says, I'm holding an evidentiary hearing as to whether or not you have authority, the authority that you claim. And he held the evidentiary hearing, looked at the contracts, like they did here, they came in after the fact and says, here's our samples of our contracts. And Judge Orrick says, this doesn't give you authority to opt people out. This is a standard boilerplate language that you will administer people's claims. I find as a fact that you don't have that authority. That's the background against which Judge Underhill was acting here. And it clearly was in his discretion to say, given that history with these same administrators, with the same counsel, I want the, one of the things he was trying to avoid was having the hearing that he ultimately had to have. Avoid having me and you having to be here talking about this today. He wants to avoid having an evidentiary hearing. He says, have the people send in a postcard if they have granted, in fact, granted you authority to opt out. Not a single one of any of the plans submitted the requested postcard. What is your view as to whether or not the appellants have the ability to appeal and challenge the final judgment entered? I don't think they do under Devlin on two grounds. Number one, they are not class members. Devlin says, we have an exception to you have to be a party in order to appeal. The exception is if you are a class member who timely objected. These appellants don't meet either one of those standards. When they made their objection, they themselves had opted out of the class. So they're no longer class members. And even leaving that aside, they did not, in fact, timely object. The court will see when you look at Joint Appendix 345. I have it before me. What Loie Dannenberg says is, we represent Humana in this litigation. And then goes on to say, and we also represent other claims administrators. Not in this litigation. And that letter was not, in fact, submitted on behalf of these appellants. And when you look at the ECF form, where you have to fill in on whose behalf you're filing, it says only Humana. And then the Loie Dannenberg firm, months later, after the deadline, formally enters an appearance on behalf of these appellants. So they fail on both grounds. I would urge the court to address the merits alternatively. Because this problem needs to stop. Thank you. Thank you, Your Honor. I just wanted to make two brief points with respect to the insurer's appeal. First, on this issue of preservation, I agree with Mr. Shadowin's characterization of the record. I just wanted to add one point on that. The defendants moved to strike the Humana letter on the ground that they were not a member of the class and did not have the ability to object to the class opt-out procedures of the class settlement. In response to that, Humana dropped this issue and focused on other issues that are no longer at issue in the appeal, precisely because they did not have any basis to object to that issue. And as Mr. Shadowin indicated, they were not, at that point, identifying that they were representing any other particular clients that are now the appellants in this appeal. The only other point I wanted to draw in sort of illustrating the difficulty of the other side's position and the chaos it would cause and why Judge Underhill acted well within his discretion to acquire clear notices of authority, the other side acknowledged in the hearing below that there's a lot of variability within the industry and that customers changed within the scope of the class period. So it's also the case that you can't do a partial opt-out. There was no ability to opt-out for only part of the class period. So as a result of their approach, there would be complete chaos about whether a particular insurer had authority with respect to particular customers for what period. They also acknowledged that the relevant contractual language differs significantly with the industry. So given all that variability, they wanted Judge Underhill to accept their mere say-so that we have the authority to act on behalf of these hundreds and hundreds of third parties. And we think it simply cannot be an abuse of discretion for Judge Underhill to say you have to come forward with more than that, and they did not. If the Court has no questions, we'll rest on our briefs. Thank you. Thank you. We'll hear the rebuttal. Thank you, Your Honors. First, I'd just like to say I think it's remarkable that it was noted that this is not our first rodeo on this. I think that the history of these cases is, in fact, a history of consistently ratcheting up the difficulty of reasoned, informed opt-outs on the part of self-funded plans. For instance, in the Scaloxin case, the plans simply gave up. In the lidoderm case, they settled in the face of it. This case takes it to yet another level, whereas the third-party administrators are permitted to opt in to file a claim, excuse me, Judge Cote, but not to opt out. That's what's particularly troubling about this case. Yes, it's not the first rodeo. This was set up by the settling parties to advantage them. As to the abuse of discretion, I have very little time, but to Judge Parker's objection, it's bounded discretion, and the boundaries of that are the due process right and the effect on the substantive rights of the parties. So, below Special Appendix 59, which is the oral argument, there was reference to a lot of interchangeability that claims administrators are fired and get new clients, and it's a shifting field constantly. So, aren't you, in response to the argument made here, aren't you asking us to do something that is entirely impractical? No, Your Honor. It's not impractical. It's a problem that is not of record that it's actually real, first of all. I mean, there's been no showing. This was, I think, your counsel below, Mr. Rabinovitz, was explaining. He noted that customers do change claims administrators in the context of a discussion in which he noted that a claims administrator could easily figure out which was which and adjust the claims accordingly. What does that mean? I don't understand what you just said. The original representation was made in the St. Philip Declaration, in which it was said that claims administrators, when confronted with claims that apparently conflicted, could, by a simple process, figure out which claims were in and which were out. And that's been taken out of context, we submit, and thrown in our face that this creates an insuperable problem. To address the actual point that you're raising, as to whether this would create chaos, it seems to me that it's something that could be easily dealt with with a few lines in the settlement order as to what one does in that situation. If a plan were to change customers in the middle of the class period, we were told that you must either opt out or opt in for a particular claim. These are series of claims. I don't know why they couldn't be parsed out more clearly. It's not difficult, as we've shown, because we've managed to produce all of this purchase information for claims administrators, who, after all, this is their business, to produce the data that would permit just such a parsing out. A lot of this follows on to Judge Parker's concern about, and his question to me about due process, and whether Judge Underhill abused his discretion in avoiding this problem. I would say again that, yes, there's discretion, but it's bounded by these concerns of the due process right to opt out. And remind me, what specifically are the due process claims that are so pressing? Excuse me? Sorry. Remind me, please, specifically what the due process claims are that you're especially worried about? The Supreme Court in Schutz said that there is a due process, that the right to opt out is driven and informed by due process. Here, where it's been conceded that there is authority on the part of the claims administrators to file a claim, a far more solemn and intrusive act on the part of the third-party administrators, third-party administrators, with respect to their clients, it is an abusive discretion to make this disproportionate additional burden to opt out. It should be easier, not harder. But it is cut in the opposite direction, because the due process right belongs to the individual claimant, not the claims administrator. But we have been delegating... Is that right? The thesis, yes, and so does the underlying... You're not a class member. The individuals are the ones who, according to what you just told me, have the due process right to opt out, right? Is that correct? But the entire premise of our argument is that we have been delegated the responsibility and the discretion to prosecute these claims, including to the extent that they are infused with the due process right. And Judge Underhill was just trying to assure himself that what you said was true, that you did have that authority. But he was satisfied, was he not, that, again, the more intrusive... You're repeating yourself. Thank you. We'll hear from your colleague. Thank you. Very briefly, Your Honors, regarding where this argument is frivolous, I would point, Your Honors, to the Flonase decision out of the Third Circuit. When we took... I argued that case at the district court and the appellate level as well. Our argument was called radical and unfounded. We won both at the district court and the appellate level. In that case, there were some claims that were proprietary to the government, right? And we don't have that here. Correct, Your Honor. So it is not on all fours with Flonase. That's acknowledged. Isn't that a significant difference? Well, yes, it can be, but in what way is it significant? Now, the MDL court in this case, in ordering remand, which is part of this case, said that the Orange County's case, seeking injunctive relief, civil penalties, and restitution on behalf of all the people of the state of California, was a sovereign exercise of police power. So that, I think, puts it into the remit of Flonase that this area of the conflict between Rule 23 and the 11th Amendment is real, and it's being developed now. The district court said, look, it's an interesting issue. I appreciate you coming out here and raising it, but I just obviously disagree. He also said, I'm hopeful, frankly, of avoiding a bunch of writing here on a complex issue. You may disagree, but this is not a frivolous argument. No, no, I just want to be clear. I didn't say it was frivolous. I just asked your opponent whether she said it was frivolous. Thank you, Your Honor. She said she did think it was frivolous. In any event, we will reserve decision.